UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ALTERNATIVE INVESTMENT RESOURCE LLC
and PORTFOLIO REALTY LLC,

                    Plaintiffs,

   -against-

MOUNT KELLETT CAPITAL MANAGEMENT LP
and BLACKPEARL REAL ESTATE, LLC,

                    Defendants.
-------------------------------------------------------------X

JUDGE KAPLAN

Case No.: 13 CV 8162

**COMPLAINT**

(ECF Case)

RECEIVED NOV 15 2013 U.S.D.C. S.D.N.Y. CASHIERS

      Plaintiffs, Alternative Investment Resource LLC and Portfolio Realty LLC, by their attorneys, Herzfeld & Rubin, P.C., as and for their Complaint against the Defendants, allege upon information and belief as follows:

### PRELIMINARY STATEMENT

      1.     Defendants are commercial real estate investors with a portfolio of properties worth over $7 billion.

      2.     Defendants, however, typically do not invest alone. Rather, they often seek out co-investors and partners with whom they jointly invest in properties or other partners with whom they would operate a property.

      3.     Beginning in 2011, Defendants reached out to Plaintiffs, telling them that Defendants were in a joint venture partnership looking for additional co-investors or operating partners with whom they could purchase commercial real estate.

      4.     Defendants asked Plaintiffs to introduce them to other potential co-investors or operating partners and individuals in the real estate business to establish on-going investing or operating relationships.

5. Defendants further told Plaintiffs that they would compensate Plaintiffs if Defendants closed on any transaction involving the co-investors, partners or others to whom Plaintiffs introduced to them, in accordance with industry custom and practice.

6. Relying on Defendants' representations, Plaintiffs introduced Defendants to many of their contacts, whom Plaintiffs had expended substantial time, effort, and goodwill meeting and cultivating.

7. Defendants subsequently closed one or more deals with co-investors or operating partners introduced to them by Plaintiffs, including an approximately $190,000,000 purchase of the landmark John Hancock Center in Chicago.

8. Defendants, however, failed and refused to compensate Plaintiffs as promised and agreed.

9. Additionally, it turns out that rather than Defendants being in a joint venture with each other, one of the Defendants was merely acting as a broker for the other and was compensated on the John Hancock Center deal and other deals for acting as a broker based on the introduction of co-investors or partners that actually was Plaintiffs' doing.

10. Defendants knowingly and intentionally misrepresented their relationship in order to induce Plaintiffs to introduce them to their contacts, which Plaintiffs would not have done had they known that one of the Defendants was acting as a broker.

11. In this action, Plaintiffs seek damages of at least $2.9 million, for fraudulent inducement, breach of contract, unjust enrichment, *quantum meruit* and promissory estoppel, as well as declaratory and injunctive relief.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332, as the amount in controversy exceeds $75,000, exclusive of interest and costs, and the Plaintiffs and Defendants are citizens of different States.

2

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because Defendants are citizens of the State of New York and a substantial part of the events or omissions giving rise to the claim occurred in the District.

## PARTIES

14. Plaintiff Alternative Investment Resource LLC ("AIR") is an Illinois limited liability company, with its principal place of business in Chicago, Illinois.

15. Plaintiff Portfolio Realty LLC ("Portfolio") is a New Jersey limited liability company, with its principal place of business in Lakewood, New Jersey.

16. Defendant Mount Kellett Capital Management LP ("Mount Kellett") is a Delaware limited partnership, with its principal place of business in New York, New York.

17. Defendant Blackpearl Real Estate, LLC ("Blackpearl") is a New York limited liability company, with its principal place of business in Los Angeles, California.

## FACTUAL BACKGROUND

18. In or around June 2011, Max Fowles-Pazdro ("Fowles"), Blackpearl's principal and self-proclaimed "visionary" fashion designer-*cum* international businessman, contacted David Tenenbaum ("Tenenbaum"), Portfolio's principal.

19. Tenenbaum is a licensed real estate broker.

20. In several phone conversations during June, 2011, Fowles told Tenenbaum that he was in a joint venture with a New York investment firm and that they were looking for co-investors or operating partners to purchase commercial properties.

21. The investment firm Fowles was referring to was Mount Kellett, which was founded by former Goldman Sachs executives in or about 2008.

22. In an email dated June 30, 2011, Fowles provided Tenenbaum with a confidential overview of Mount Kellett, which Mount Kellett had prepared. In that email,

3

Fowles wrote, "Please find attached the bio on the fund [i.e., Mount Kellett] which is my JV partner."

23. Fowles subsequently introduced Tenenbaum to Andrew Axelrod ("Axelrod"), a Managing Director at Mount Kellett.

24. In an email to Tenenbaum and Fowles, dated October 12, 2011, Axelrod confirmed the nature of Mount Kellett's relationship with Blackpearl, representing that Mount Kellett and Blackpearl were in a "joint venture for real estate transactions in the US."

25. In or about November or December 2011, Tenenbaum introduced Steven Schmidt ("Schmidt"), AIR's Managing Partner, to Fowles and Axelrod.

26. During telephone calls in late 2011, as well as thereafter, Axelrod and Fowles told Tenenbaum and Schmidt that Plaintiffs would be compensated if Mount Kellett and Blackpearl closed any deals with the contacts Schmidt and Tenenbaum introduced to them, as is customary in the industry.

27. The compensation to be paid to AIR and Portfolio by Mount Kellett and Blackpearl was not tied to any particular deal, but rather was to be paid upon any transaction Mount Kellett or Blackpearl closed involving one of the clients or contacts provided to them by Schmidt or Tenenbaum.

28. During the first quarter of 2012, Schmidt spoke with Axelrod by phone, during which conversation Axelrod again confirmed that Mount Kellett and Blackpearl were in a joint venture partnership and were asking Plaintiffs to introduce them to co-investors or operating partners.

29. Based upon these representations, Plaintiffs provided Defendants with the names and contact information of many of their contacts and clients who could be potential co-investors or operating partners with Defendants, including the Lynd World Group ("Lynd"), DLA Piper, Moody National, Younan Group, Sun Companies, and others.

4

30. Plaintiffs also arranged personal introductions for Defendants with these potential investors or operating partners.

31. In emails to Tenenbaum dated November 14, 2011, Fowles indicated, "had a look at the website of Moody National. Certainly looks interesting for us. . . . I would suggest that we look to set-up a call with Moody National this week and we can jump into more detail. Let me know some times that would work for you and Moody National."

32. In those November 14, 2011 emails, Fowles further represented that "We are now close to completing the final raise on Fund 2 – which will be over $4 bln in equity. As mentioned before we have a minimum equity investment per transaction of $30 mln." The "We" Fowles referred to in those emails was Mount Kellett.

33. In or about February 2012, Tenenbaum forwarded to Fowles information regarding Lynd, with whom Schmidt had an existing relationship.

34. In an email to Tenenbaum, dated April 3, 2012, Fowles asked "can you please let me know who is the senior guys [sic] at Lynd Group who we should be speaking to in-order to start a relationship with them...? [ ] Andrew [Axelrod] will call them tomorrow once you get me this and then we can start the ball rolling on the relationship."

35. On or about April 9, 2012, Tenenbaum accompanied senior officials from Lynd to meet with Axelrod at Mount Kellett's headquarters in New York City. There, they discussed Lynd working with Defendants to jointly invest in commercial properties in the United States.

36. Prior to the arrangements and introductions made by Plaintiffs, Mount Kellett and Blackpearl had no contact or relationship with Lynd.

37. In or around December 2012, Plaintiffs learned that Mount Kellett was close to finalizing a deal involving Lynd, which was referred to as the 'LQ deal.' Plaintiffs had no involvement in that deal other than to have introduced Defendants to Lynd.

5

38. On or about December 6, 2012, Tenenbaum emailed Axelrod and Fowles inquiring about fees to be paid to Plaintiffs in accordance with the prior representations Defendants had made that they would compensate Plaintiffs if they closed on any deals with any of the contacts provided to them by Plaintiffs.

39. Axelrod responded by email that same day, writing that if the deal closes, "we will work out the fees, no issue."

40. Tenenbaum also met with Axelrod at Mount Kellett's offices in New York City in or around December 2012. During that conversation, Axelrod apologized that defendants had not informed Plaintiffs of the possible LQ deal and said that Mount Kellett and Blackpearl wanted Plaintiffs to continue to bring them potential co-investors and operating partners. Axelrod promised that Defendants would inform Plaintiffs prior to any closing involving co-investors or operating partners brought to them by Plaintiffs, and that Defendants would compensate Plaintiffs upon any such closing.

41. In an email to Tenenbaum, Schmidt and Fowles, dated January 3, 2013, Axelrod again confirmed that Plaintiffs were to be paid if Mount Kellett and Blackpearl closed on any deal with one of Plaintiff's contacts. Specifically, after asking Plaintiffs to "pass along any energy opportunities to me", Axelrod wrote, "As soon as we get closer to a deal, we will come back to you to finalize the fee. I assure you (as I have in the past) that we're not doing this transaction without finalizing the details of your agreement."

42. In or about January 2013, Fowles sent an email to Plaintiffs asking them to meet with him and Axelrod in New York City to discuss their ongoing relationship. Defendants again indicated that Mount Kellett and Blackpearl were in a partnership and looking for Plaintiffs to provide them with potential co-investors.

43. On February 19, 2013, Fowles emailed Tenenbaum asking him to provide "new partners to speak to".

6

44. On March 25, 2013, Fowles sent a text message to Tennenbaum asking him to set up meetings in New York City with additional co-investors or operating partners.

45. In or about June 2013, Mount Kellett and Lynd purchased the John Hancock Center in Chicago, Illinois for a reported $145,000,000.

46. Blackpearl was compensated at least $500,000 as a broker's fee on that deal, although neither Blackpearl nor Fowles is a licensed broker.

47. Plaintiffs received no compensation in connection with the closing of the John Hancock Center, nor for any other transaction which Defendants have closed with the contacts provided to them by Plaintiffs.

48. Had Plaintiffs known that Blackpearl was a broker, or acting as a broker, they would not have provided their clients and contacts to Defendants.

49. In or about July 2013, after learning that they were wrongfully cut-out of the fees for the John Hancock Center closing, Plaintiffs contacted Axelrod about their fee.

50. During that telephone conversation, Axelrod told Plaintiffs that Blackpearl was never an investment partner with Mount Kellett, in direct contravention of his and Fowles' previous representations. Axelrod also told Plaintiffs that it was Blackpearl, not Plaintiffs, who introduced Lynd to Mount Kellett, which is utterly untrue, and that was the reason Blackpearl was compensated instead of Plaintiffs.

51. Plaintiffs have been damaged by Defendants' wrongful acts in an amount to be proven at trial, but not less than $2.9 million.

### FIRST CAUSE OF ACTION
(Fraud)

52. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth in full herein.

53. Both Blackpearl and Mount Kellett represented to Plaintiffs, including in their respective emails of June 30, 2011 and October 12, 2011, that they were in a joint venture partnership to purchase properties. Those representations were false when made and Defendants knew they were false, as indicated by Axelrod during his phone calls with Plaintiffs in July 2013.

54. Those representations were made to induce Plaintiffs to provide them with the names of potential co-investors or operating partners, which Plaintiffs would not have done if they had known that Blackpearl would be acting as a broker rather than as a joint venture partner with Mount Kellett.

55. Relying on Defendants' representations, Plaintiffs introduced Defendants to many of their clients and contacts, including Lynd.

56. Plaintiffs have been damaged by Defendants' fraud in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

57. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth in full herein.

58. Plaintiffs had an agreement with Defendants whereby Defendants would compensate Plaintiffs in accordance with industry custom and practice if Defendants closed on any deal or transaction involving a co-investor or operating partner introduced to them by Plaintiffs, regardless of whether Plaintiffs were the originating source of the transaction.

59. Plaintiffs performed their obligations, by, among other things, introducing Defendants to many of their clients and contacts who could be co-investors or operating partners with Defendants, including Lynd.

60. Defendants breached their obligations by failing to compensate Plaintiffs when they closed on transactions involving contacts provided by Plaintiffs, including the John Hancock Center transaction.

61. Plaintiffs have been damaged by Defendants' breach of contract in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
(Unjust Enrichment)

62. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth in full herein.

63. Defendants benefitted unfairly at Plaintiffs' expense, in that Defendants reaped substantial profits, fees, and other benefits from Plaintiffs' efforts in presenting potential co-investors, partners and deals to Defendants.

64. It is against equity and good conscience to allow Defendants to retain the benefits they obtained based on Plaintiffs' efforts.

65. Defendants are liable to Plaintiffs for unjust enrichment in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
(*Quantum Meruit*)

66. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth in full herein.

67. At Defendants' request and upon Defendants promise of compensation, Plaintiffs in good faith introduced Defendants to many of their contacts and clients as potential co-investors or operating partners.

68. Defendants accepted Plaintiffs' services, and repeatedly asked Plaintiffs to continue to introduce them to additional contacts and advise them of potential deals.

69. Defendants are liable to Plaintiffs for the reasonable value of their services in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
### (Promissory Estoppel)

70. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth in full herein.

71. Defendants made a clear and unambiguous promise to Plaintiffs that they would compensate Plaintiffs if they closed on any transaction involving a contact or client provided by Plaintiffs, as is customary in the industry.

72. Plaintiffs reasonably relied on Defendants' promise by making numerous introductions to Defendants of Plaintiffs' clients and contacts as potential co-investors or operating partners with Defendants.

73. Plaintiffs have been damaged by Defendants' actions in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION
### (Declaratory Judgment)

74. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth in full herein.

75. Plaintiffs introduced Defendants to many of their contacts and clients as potential co-investors or operating partners based upon Defendants' representations that Defendants were joint venture partners looking for potential co-investors and partners and that they would compensate Plaintiffs if they closed on any transaction involving any of those contacts or clients.

76. Defendants have failed and refused to compensate Plaintiffs upon closing with one or more co-investor or operating partner introduced to them by Plaintiffs.

77. An actual and justiciable controversy exists as to whether Defendants must compensate Plaintiffs if they close on any transaction involving a contact or client introduced to them by Plaintiffs.

78. Plaintiffs are entitled to a declaration, pursuant to 28 U.S.C. § 2201, that Defendants must compensate Plaintiffs if they close on any transaction involving an individual or entity introduced to them by Plaintiffs.

## SEVENTH CAUSE OF ACTION
### (Injunctive Relief)

79. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth in full herein.

80. Plaintiffs have expended substantial time, effort, and goodwill meeting and cultivating relationships with their clients and contacts.

81. Plaintiffs provided Defendants with information regarding their clients and contacts upon the representation by Defendants that they were in a joint venture partnership to purchase commercial real estate.

82. If Plaintiffs had known that one or both of the Defendants would be acting as a broker, rather than as a partner in a joint venture, Plaintiffs would not have provided Defendants with those introductions.

83. Defendants' acts and omissions have usurped the substantial efforts of Plaintiffs to meet and cultivate clients and contacts and damaged the goodwill developed by Plaintiffs.

84. Plaintiffs are entitled to an injunction permanently enjoining Defendants from initiating or soliciting contact with any of the contacts or clients introduced to them by Plaintiffs.

85. Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a Judgment against Defendants: (a) awarding monetary damages in an amount to be proven at trial, but not less than $2.9 million, plus interest and punitive damages to the extent permissible by law; (b) declaring that Plaintiffs will be compensated if either Defendant engages in any transactions involving any individual or entity introduced to them by either of the Plaintiffs; (c) permanently restraining and enjoining Defendants from initiating contact with and/or soliciting any individual or entity introduced to them by either of the Plaintiffs; (d) awarding costs, disbursements, and reasonable attorneys' fees to the extent permissible by law; and (e) granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated:   New York, New York
         November 15, 2013

HERZFELD & RUBIN, P.C.

By: _____
    Robert L. Lash, Esq. (RL0925)
*Attorneys for Plaintiffs*
125 Broad Street
New York, New York 10004
(212) 471-8500
rlash@herzfeld-rubin.com

1216678.1